## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

PATRICIA E. KIMBROUGH,              )
                                    )
          Plaintiff,               )
                                    )
vs.                                 )          Case No. 11-cv-676-GKF-TLW
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
          Defendant.               )

## REPORT AND RECOMMENDATION

     This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Patricia E. Kimbrough seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

     A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a forty-three year old female, applied for Title II and Title XVI benefits on August 3, 2009, alleging a disability onset date of April 4, 2009. (R. 128-34, 135-37). Plaintiff's last insured date under Title II is December 31, 2013. (R. 151). Plaintiff initially alleged that she was unable to work due to breast cancer and uterine tumors, but she later claimed that she was experiencing pain, depression, fatigue, low self-esteem, panic attacks, headaches, chest pain, back pain, drowsiness from her medications, and limitations in raising her left arm. (R. 155-61, 181-88). Plaintiff's claims for benefits were denied initially on November 3, 2009, and on reconsideration on May 4, 2010. (R. 70-73,74-78, 79-82, 84-87, 88-90). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 91). The ALJ held a hearing on April 19, 2011. (R. 27-64). The ALJ issued a decision on May 16, 2011, denying benefits and finding plaintiff not disabled. (R. 8-26). The Appeals Council declined plaintiff's request to review the case; therefore, the ALJ's decision serves as the final decision of the Commissioner. (R. 1-5).

Plaintiff timely appealed the Commissioner's decision. (Dkt. # 2). On appeal, plaintiff alleges three points of legal error: (1) that the ALJ erred in his step five analysis; (2) that the ALJ failed to conduct a proper credibility analysis; and (3) that the ALJ improperly weighed the medical source opinions. (Dkt. # 15).

### The ALJ's Decision

The ALJ determined that plaintiff had not performed any substantial gainful activity since April 4, 2009. (R. 13). The ALJ found that plaintiff had the following severe impairments: breast

cancer, depression, anxiety, headaches, substance abuse (marijuana dependence), vision problems, shortness of breath, carpal tunnel syndrome, and uterine tumor. (R. 13). The ALJ gave special consideration to Listing 13.00 (malignant neoplastic disease); Listing 2.00 (special senses and speech); Listing 3.00 (respiratory systems); and Listing 1.00 (musculoskeletal system). (R. 14). Despite her impairments, however, plaintiff did not meet or medically equal a listing. Id.

The ALJ also considered plaintiff's mental impairments under Listing 12.04 (affective mood disorders) and Listing 12.06 (anxiety related disorders). Id. Applying the "paragraph B" criteria, the ALJ determined that plaintiff had mild limitations in activities of daily living; social functioning; and concentration, persistence, and pace. Id. Plaintiff had no episodes of decompensation. Id. Accordingly, the ALJ determined that plaintiff's mental impairments did not meet or medically equal a listing. Id.

To determine plaintiff's residual functional capacity, the ALJ considered plaintiff's testimony and the medical evidence. (R. 17-19). Plaintiff testified that she had worked as a customer service representative, business manager, tax preparer, and food preparer. (R. 17). Plaintiff testified that she stopped working at a deli due to her cancer diagnosis. Id. Plaintiff underwent a mastectomy and, at the time of the hearing, had been cancer free for two years. Id. Plaintiff reported self-esteem issues as a result of her mastectomy. Id. Plaintiff also stated that she could only lift her left arm to shoulder level and that she experienced sharp pains in her chest. Id. Plaintiff also had a uterine tumor removed and, as a result, needed to use the restroom frequently. Id.

Plaintiff testified that she suffered headaches twice a month. Id. She described these headaches as migraines that lasted approximately thirty minutes, which she treated by lying down. Id. She also complained of blurry vision and stated that "her doctors have told her she

may need reading glasses." (R. 17). Plaintiff took pain medication for "sharp pains." Id. For depression and anxiety, plaintiff took medication and attended counseling. Id. Plaintiff also admitted to smoking marijuana every other day, but she denied using any other illegal drugs. Id. Plaintiff stated that her medication made her drowsy, so she napped about two hours every day. Id. At night, however, she tossed and turned, sleeping only six hours. Id.

Plaintiff testified that she vacuumed the floor sometimes and cooked occasionally, but she did no other chores. Id. She did no shopping, but she did go out with friends and family and attend a cancer survivor group. Id. Plaintiff was able to watch television, read for pleasure, and spend time with her grandchildren. Id.

Plaintiff stated that she could sit for twenty to twenty-five minutes, stand for five to ten minutes, walk a block, and lift ten pounds. Id. She could bend over and touch her knees and toes. Id. She could squat, but could not stand up again without sitting down first. Id. She could climb stairs slowly. Id. She testified that she experienced no trouble using her hands and fingers, but she later stated that she had recently experienced some tingling in her hands and feet. Id. She had not received treatment for those symptoms. Id.

The medical records documented plaintiff's left mastectomy with immediate reconstruction on August 21, 2009. Plaintiff experienced some pain through September 2009, but her reconstruction surgery was completed in December 2009. Id. In March 2010, plaintiff developed a "wound dehiscence with infection secondary to smoking." (R. 18). Plaintiff underwent surgery in late March 2010, and during a second surgery in April 2010, the implant was removed. Id.

Plaintiff sought treatment for stress in January 2010. Id. She was initially diagnosed with post-traumatic stress disorder, generalized anxiety disorder, and depression. Id. She received

medical management treatment from a psychiatrist from January 2010 through February 2011. (R. 19). Plaintiff was prescribed several medications to treat her anxiety and depression, and she consistently denied experiencing any side effects from those medications. Id. The doctor's notes generally indicated that plaintiff was alert and oriented, with intact memory, attention, and concentration. Id. The ALJ cited the treatment note from February 17, 2011, which found that plaintiff's "anxiety symptoms are still present, but not especially impairing," and her depression was improving. Id. The treating psychiatrist assigned plaintiff a GAF score of 70 at that appointment. Id.

In March 2010, a psychologist performed a consultative psychological examination. (R. 18). Plaintiff told the psychologist, "I have mood swings, and I get upset." Id. The psychologist noted that plaintiff had been seeing a doctor monthly for three months to receive treatment for depression. Id. The psychologist found that plaintiff's memory was intact and that her social-adaptive behavior was normal. Id. He opined that plaintiff's depression was situational, related to her family issues and to her general medical condition. Id. He found her depression to be moderate, at most, and stated that it would not interfere with her ability to perform routine repetitive tasks on a regular basis. Id. His diagnoses included mild situational depression, secondary to "relational difficulties," and mild depression NOS, secondary to plaintiff's medical condition. Id. He assigned plaintiff a GAF score of 70. Id. An agency doctor also reviewed plaintiff's records in March 2010 and found plaintiff's mental impairments to be non-severe. (R. 19).

After reviewing this evidence, the ALJ gave great weight to the opinions of the consultative examining psychologist and the agency doctor. Id. He found that their opinions were consistent with the medical evidence. Id. The ALJ found that plaintiff's complaints were not

fully credible, citing her contradictory statements regarding the side effects of her medication and her memory and concentration capabilities. (R. 19). The ALJ concluded that plaintiff retained the residual functional capacity to perform light work with the following restrictions: occasional climbing, stooping, squatting, crouching, crawling, kneeling, pushing/pulling, and use of foot controls; no lifting about the shoulder with her left arm; slight limitation in fingering, feeling, and grasping;[1] avoid fine vision work;[2] avoid cold and damp environments; avoid dust fumes, and gases; work only in low noise and low light environments (general commercial environments permitted); allow easy access to restrooms; and restrict work to simple, repetitive, and routine tasks. (R. 15).

Based on the residual functional capacity findings, the ALJ concluded that plaintiff could not perform any of her past relevant work, either because it required a higher skill level or a higher exertional level than plaintiff could perform. (R. 20). Relying on the testimony of a vocational expert, the ALJ found that plaintiff could perform other work. (R. 20-21). Representative jobs included a hand packager, sorter, cashier, food order clerk, and inspector/checker. (R. 21). Because plaintiff could perform other work, the ALJ held that she was not disabled. Id.

**Plaintiff's Medical Records**

On April 23, 2009, plaintiff received a mammogram through a free screening program. (R. 433, 471). The mammogram revealed "suspicious" spots in plaintiff's left breast. (R. 471). Plaintiff received a second mammogram in June 2009 and a biopsy in July 2009 confirmed the

---

[1] The ALJ defined the "slight limitation" as the ability to use the hands and fingers but the avoidance of "extensive amounts of small tedious tasks like pen clip basting, working with small nuts and bolts." (R. 60).

[2] The ALJ defined this restriction as follows: "they can use their eyes, but they shouldn't do any extensive amounts of small, tedious tasks with their eyes." Id.

diagnosis of breast cancer. (R. 453, 464, 470). Plaintiff scheduled a mastectomy for August 2009. In the meantime, plaintiff was referred to another doctor in June 2009 after she complained of pelvic pain. (R. 257-62). An ultrasound revealed multiple uterine fibroids. (R. 244). A few weeks before her scheduled mastectomy, plaintiff had a hysterectomy. (R. 215-38,239-43).

Plaintiff received a mastectomy in August 2009, and doctors immediately began the process of reconstructing her left breast. (R. 263-88). The reconstruction process took several months, but plaintiff tolerated the process well, and surgery was completed in December 2009. (R. 508-16). In March 2010, however, plaintiff presented for an appointment with a possible infection in her left breast and an "exposed implant." (R. 717). Plaintiff's surgeon performed an "incision revision" in the office, and a second "incision revision" in a surgical setting. Id. The surgeon determined that plaintiff had continued smoking, despite warnings that smoking could compromise the reconstruction. (R. 716). In April 2010, plaintiff's surgeon was forced to remove the implant and begin the process of reconstructing plaintiff's breast a second time. (R. 715). Plaintiff initially appeared to do well, but the reconstruction surgery was ultimately unsuccessful. (R. 713-15). In May 2010, plaintiff's surgeon removed the tissue expander used to prepare plaintiff's body for the implant. (R. 713). The surgeon suggested that plaintiff could begin reconstruction surgery a third time after she healed properly. Id.

Following the mastectomy, plaintiff's cancer treatment program included taking a cancer medication called tamoxifen. (R. 433-34). Plaintiff tolerated the medication well until September 2010, when she began experiencing hot flashes. (R. 577). Her oncologist added Effexor, which resulted in "dramatic improvement in her hot flashes." (R. 576-77). In the January 2011 treatment note, the oncologist wrote that plaintiff "admits to no problems at all, difficulty with sedation [sic] any other problems, certainly no suicidal ideation; she feels great." (R. 567).

In September 2009, approximately one month after her mastectomy, plaintiff sought treatment at the OU Internal Medicine Clinic. (R. 499-502). She complained of backaches, and upper respiratory infection, and migraines. Id. A doctor diagnosed her with "backache NOS" and migraines and prescribed Lortab and Soma. (R. 501-02). In December 2009, plaintiff made another appointment with the clinic. (R. 496-98). At that time, she complained of daily headaches that lasted an hour and increased stress due to her breast cancer reconstruction surgery and "numerous personal/family stresses." (R. 496). Plaintiff stated that the headaches caused blurry vision, dizziness, and weakness in her legs. Id. She was diagnosed with depression and prescribed an anti-depressant. (R. 498). She was also referred to a psychiatric clinic. (R. 498, 538).

The following month, January 2010, plaintiff saw a psychiatrist. (R. 538, 539-45). Plaintiff was diagnosed with "[m]ajor depressive disorder, recurrent, moderate;" "Generalized Anxiety [D]isorder;" and "[p]ost traumatic stress disorder." (R. 538). The psychiatrist prescribed a different medication for plaintiff's mood and anxiety symptoms. Id. She also strongly recommended psychotherapy, but plaintiff indicated that she was only interested in medication management. Id. Despite her issues, plaintiff was approved to return to her "usual work." (R. 544). Plaintiff immediately began seeing a benefit from the medication, but still complained of anxiety and depression, mostly due to family and environmental stressors, for several months. (R. 625-36).

In September 2010, plaintiff mentioned audio and visual hallucinations for the first time. (R.612). She stated that "[s]he will notice something moving in her room and think it's a person or will hear a noise and think it is a baby crying in the house." Id. Plaintiff reported increased anxiety at that appointment, but she also stated that her mood was better and that her sleep,

though still interrupted by nightmares, was improving after starting a new medication. (R. 612). Despite these complaints, the psychiatrist, for the first time, recommended that plaintiff could return to her "usual work." (R. 614). The psychiatrist continued to recommend a return to plaintiff's "usual work" for the remainder of plaintiff's sessions. (R. 597-611).

By January 2011, plaintiff was much improved. (R. 602-06). Although plaintiff was still complaining of feeling "down" and anxious, she stated that she was "doing alright" and having "more good days than bad." (R. 602). Plaintiff's improvement continued into February 2011, the date of her last recorded appointment with the psychiatrist. (R. 597-601). During that visit, the psychiatrist noted that plaintiff's symptoms of anxiety were still present "but not especially impairing." (R. 600). He again opined that she could return to work. (R. 599).

At each appointment, plaintiff was asked about compliance with her medication and about side effects. (R. 597-636). Each time, plaintiff reported compliance with her medication and denied any side effects. Id. Although plaintiff's medication was occasionally adjusted, she never cited any complaints of drowsiness. Id. Plaintiff did complain about an inability to concentrate, but her psychiatrist associated that symptom with plaintiff's depression and anxiety rather than the medication. Id.

Shortly after plaintiff began psychiatric medication management, the agency ordered a consultative psychological examination. (R. 547-50). Plaintiff saw Dr. Minor Gordon in March 2010. Id. Plaintiff complained of mood swings and issues with a cheating fiancé. (R. 546). During his examination, Dr. Gordon noted that plaintiff's mood was "one of mild depression," but she was attentive, alert, and cooperative. (R. 548). He assessed plaintiff as being of average intelligence with normal social-adaptive behavior. Id. He opined that plaintiff "could pass judgment in a work situation, avoid common danger, maintain her o[w]n person[al] hygiene, as

well as communicate comfortably in a social circumstance." (R. 548). Plaintiff's immediate recall, short term memory, and long term memory were all intact. (R. 549). Dr. Gordon concluded that plaintiff suffered mild situational depression, "secondary to her relational difficulties with her fiancé," and mild depression NOS, "secondary to her general medical condition." Id. He also stated that plaintiff "should be able to perform some type of routine repetitive task on a regular basis" and "would be able to relate adequately with co-workers and supervisors on a superficial level for work purposes." Id. He assessed plaintiff with a GAF score of 70. Id.

A few months after the consultative psychological examination, plaintiff also began therapy sessions with a licensed marriage and family therapist at Family and Children's Services. (R. 728-51). In July 2010, plaintiff complained of physical pain and poor body image associated with her breast cancer surgeries. (R. 750-51). She later opened up about her family issues, her fear of cancer returning, her struggles with body image, and her poor relationship with her fiancé. (R. 746-49). Her therapist encouraged her to become more engaged, and by October 2010, plaintiff reported being happy and proud of her progress, which included participation in a breast cancer walk. (R. 745). Plaintiff continued to experience depressive symptoms related to her family relationships, but she continued to find happiness through a survivor's group. (R. 734-45). Only once, in late January 2011, did plaintiff appear groggy and unfocused, and plaintiff attributed her inability to focus on a muscle relaxant she had received for breast pain. (R. 739).

**The ALJ Hearing**

The ALJ held a hearing on April 19, 2011. Before swearing plaintiff in to take her testimony, the ALJ questioned whether plaintiff was awake and alert enough to participate in the proceedings. (R. 31-32). Once plaintiff was under oath, she testified that she had last worked at a

deli preparing food but quit due to complications from breast cancer. (R. 36-37). Plaintiff also described past work as a tax preparer, customer service representative, cashier, and bill collector. (R. 38-39).

Plaintiff stated that her medications made her drowsy and that her vision was blurry when she reads, writes, or works with numbers. (R. 36, 39). When asked about her impairments, plaintiff stated that she was "on depressants" and "on hot flashes." (R. 40). When her attorney re-directed her, she stated that she still had problems associated with breast cancer and her left mastectomy, although she testified that she had been cancer free for two years. Id. Plaintiff described feeling "like less of a woman" and experiencing pain on her left side. (R. 41). Plaintiff also complained of residual pain from undergoing surgery for a uterine tumor. Id.

Plaintiff stated that her pain medication would "wear off," but her antidepressants relaxed her "a lot." (R. 42, 43-44). She complained that she needed to urinate frequently and that she experienced migraine-like headaches twice a month. (R. 42). Her headaches lasted thirty to forty-five minutes and required her to lie down until they passed. Id. Neither of these symptoms, however, appeared related to her medications. (R. 42-43). Plaintiff also complained that she could not read a book without holding it far away, but she did not know whether her vision problems were the result of side effects from her medication or simply a need for reading glasses. (R. 45). Plaintiff also stated that she could only raise her left arm to shoulder level, and even that movement caused her pain. (R. 43). She testified that her short term memory "comes and goes." (R. 44). She stated that she had no difficulty getting along with other people. Id.

Plaintiff described limited activities of daily living. Her only household chores were occasional vacuuming and light cooking. (R. 46). Otherwise, she spent her time watching television, reading, visiting family and friends, playing with her grandchildren, and attending a

cancer support group. (R. 46-47). Plaintiff complained her appetite fluctuated and that she only slept six hours at night. Id. She needed to nap for two hours during the day. (R. 47). Plaintiff stated that she could only sit for twenty to twenty-five minutes, stand for five to ten minutes, walk a block without resting, and lift five pounds. (R. 48-49). Plaintiff said that she could bend over and touch her knees and toes. (R. 49). Plaintiff could also squat but would need to sit down in order to get back up. Id. She could climb a flight of stairs as long as she took her time. (R. 50).

Plaintiff then testified that being around gases and smoke "slows her breathing," but she admitted to smoking cigarettes and to smoking "a joint or two every other day. (R. 51-52). She also complained about numbness and tingling in her hands and feet, but she admitted that she was not receiving treatment for those symptoms. (R.52). She said that she experienced pain in her back and abdominal area when the weather was cold and that she "just lies around" in cold weather. (R. 52-53).

Throughout the hearing, plaintiff was regularly non-responsive to questioning. For example, when asked whether she could use public transportation to get to work, she rambled about her brother being familiar with the bus system and meeting her to go with her wherever she needed to go. Id. When asked about her use of alcohol, she denied drinking because "I don't like to mix my alcohol with my liquor." (R. 45). When asked about her ability to lift a certain amount of weight, plaintiff responded that she would not lift an object by saying, "No. I'm getting my grandkids." (R. 49). It is not clear whether plaintiff misunderstood the questions, was deliberately non-responsive, or was otherwise impaired.

The vocational expert reviewed plaintiff's past relevant work. (R. 56-57). The ALJ then posed a series of hypotheticals to the vocational expert. In the first one, the ALJ asked the vocational expert to consider a person able to perform medium, light, and sedentary work with

no functional restrictions due to either anxiety and depression and a pain limitation that permitted plaintiff to change positions as needed. (R. 58). The vocational expert testified that plaintiff would be able to perform all of her past relevant work. (R. 59). In the second hypothetical, the ALJ incorporated an additional limitation of unskilled work into the first hypothetical. Id. The vocational expert offered a number of other jobs, including a hand packager, sorter, cashier, food order clerk, and inspector/checker. Id. In the third hypothetical, the ALJ described the residual functional capacity that he ultimately adopted in his decision. (R. 60). The vocational expert testified that plaintiff could perform all of the light and sedentary jobs identified in the previous hypothetical. (R. 61). Finally, the ALJ asked the vocational expert to consider a hypothetical in which plaintiff's testimony was considered entirely credible. Id. The vocational expert opined that plaintiff would not be able to perform any work. Id.

## ANALYSIS

Plaintiff raises three points of error. First, plaintiff contends that the ALJ failed to meet his burden at step five by naming other work that falls outside of the residual functional capacity findings. Specifically, plaintiff contends that some of the jobs cited require semi-skilled work and that the job descriptions violate the limitations on fine vision, push/pull, reaching, and handling. Second, plaintiff contends that the ALJ's credibility analysis is based on boilerplate language, fails to consider all of the evidence, and "ignores" and "miscasts" portions of the record. Third, plaintiff contends that the ALJ failed to explain how he determined the weight to be given to the consultative and agency physician's opinions, which did not include a review of all of the medical evidence, and failed to consider the opinions from the Family and Children's Services records.

The Commissioner argues that plaintiff misinterprets the categorization of push/pull, reaching, and vision in the <u>Dictionary of Occupational Titles</u> ("<u>DOT</u>"), as well as the definition of unskilled labor in the context of SVP ratings. The Commissioner also argues that the ALJ's credibility analysis is sufficiently detailed and supported by the evidence. Finally, the Commissioner argues that plaintiff's complaints about the ALJ's analysis of the medical opinion evidence relates solely to plaintiff's subjective statements rather than objective evidence in the record. The Commissioner contends that plaintiff is merely asking the Court to re-weigh the evidence.

**<u>Conflict Between the Other Work Findings and the DOT</u>**

Plaintiff's argument on this issue focuses extensively on the "abilities" required to perform each of the "other work" jobs cited in the ALJ's decision. Plaintiff contends that she cannot perform any of those jobs given the limitations on her vision, reaching, and fingering. Plaintiff also states that two of the jobs, cashier and food order clerk, require a reasoning level of three, when the ALJ specifically limited plaintiff to unskilled work, which requires no more than a reasoning level of two. (Dkt. # 15). The undersigned has reviewed the skill levels for each of the jobs listed by the vocational expert, however, and none require more than a SVP of two.

With respect to plaintiff's other arguments, the <u>DOT</u> defines "near vision acuity" and "far vision acuity," but it does not define "fine vision" as the ALJ described it in his hypothetical. <u>See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles</u>, App. C (United States Department of Labor, Employment and Training Administration 1993) (defining "near acuity" as "clarity of vision at 20 inches or less" and "far acuity" as "clarity of vision at 20 feet or more" and noting that the <u>DOT</u> does not rate acuity at distances between twenty inches and twenty feet). The ALJ stated that plaintiff "can use [her] eyes, but

[she] shouldn't do any extensive amounts of small, tedious tasks with [her] eyes." (R. 60). The ALJ placed a similar limitation on plaintiff's fingering, feeling, and gripping, stating "I'm not saying they can't use their hand and fingers. They can. But they shouldn't be doing extensive amounts of small tedious tasks like pen clip basting, working with small nuts and bolts." Id.

The "conflicts" that plaintiff cites are insufficient to override the ALJ's ability to rely on the vocational expert's testimony. The Tenth Circuit has recognized that "'[a]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation.'" Segovia v. Astrue, 226 Fed.Appx. 801, 804 (10th Cir. 2007) (quoting Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000)). Where the "conflict" is "implied or indirect," the ALJ is permitted to rely upon the vocational expert's testimony, "provided that the record reflects an adequate basis for doing so." Id. (internal quotations omitted). In this case, the ALJ asked the vocational expert whether his testimony deviated from the DOT, and the vocational expert testified that none of his testimony required further explanation. (R. 62). Based on the vocational expert's response and plaintiff's attorney's failure to raise any objections at the hearing, the ALJ properly relied on the vocational expert's testimony. See Poppa v. Astrue, 569 F.3d 1167, 1173 (10th Cir. 2009) (holding that an ALJ has a duty to inquire whether the vocational expert's testimony conflicts with the DOT and to resolve any apparent conflicts before relying upon that testimony); see also SSR 00-4p. The "near vision acuity" and "fine vision" distinctions are the type of implicit conflict that Segovia was intended to address, and the undersigned is satisfied that no true conflict exists.

With respect to the fingering, feeling, and grasping limitation, the DOT does state that the "hand packager" job (DOT # 753.687-038) requires constant handling and fingering, but no feeling (the DOT's term for gripping and grasping). See Dictionary of Occupational Titles,

06.04.38. Even if the Court removed the job of "hand packager" from the list of other work due to an actual conflict between the <u>DOT</u> and the vocational expert's testimony, however, the ALJ's decision cites four other jobs that plaintiff can perform. In analyzing plaintiff's ability to perform other work at step five, the ALJ may determine that jobs in "significant numbers" exist based on either the availability of work regionally or nationally. <u>See</u> <u>Botello v. Astrue</u>, 376 Fed.Appx. 847, 850-51 (10th Cir. 2010); <u>Raymond v. Astrue</u>, 356 Fed.Appx. 174, 178 n.2 (10th Cir. 2009) (unpublished). The ALJ is not required to show whether such "[w]ork exists in the immediate area in which [plaintiff] live[s]." 20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1). The four remaining jobs, when considered together, represent a significant number of jobs (1,450 in the region and 158,000 in the United States) that plaintiff can perform. <u>See</u> <u>Botello</u>, 376 Fed.Appx. at 851 (holding that reversal was not required when 67,250 jobs existed nationally and plaintiff had challenged only the number of regional jobs available); <u>Prince v. Apfel</u>, 149 F.3d 1191 (table), 1998 WL 317525) (10th Cir. 1998) (finding that 20,000 jobs was sufficient to establish "significant numbers" of jobs available). Accordingly, on this issue, the ALJ met his burden at step five.

Plaintiff also attempts to equate the ability to "reach," which is addressed in the <u>DOT</u>, with the use of hand or foot controls. (Dkt. # 15 at 3). The undersigned finds that the cases plaintiff cites do not support this proposition. <u>Bennett v. Barnhart</u>, 264 F.Supp.2d 238 (W.D.Pa. 2003), which is plaintiff's strongest case on this point, does not equate the two activities. <u>See</u> <u>Bennett</u>, 264 F.Supp.2d at 260 n.5 (stating that "[t]o the extent repetitive pushing or pulling involves the same type of activity as repetitive reaching," the vocational expert's testimony included jobs that did not require repetitive reaching). Plaintiff has failed to argue how the

limitation on reaching overhead with her left arm impacts her ability to perform the other work cited in the ALJ's decision.

Because the ALJ found a significant number of jobs that plaintiff can perform, consistent with the residual functional capacity findings in the ALJ's decision, the undersigned recommends a finding of no error on this point.

**Credibility Findings**

Plaintiff next argues that the ALJ improperly rejected plaintiff's subjective complaints and failed to make adequate credibility findings. Plaintiff cites to the ALJ's use of "boilerplate" language. (Dkt. # 15 at 4-5). Plaintiff argues that the use of this language constitutes reversible error because this language is conclusory and fails to make specific findings. Id. Plaintiff also argues that the ALJ erred in basing his credibility findings on the fact that plaintiff's statements were inconsistent with the ALJ's residual functional capacity findings, calling that language "conclusory, circular reasoning." (Dkt. # 15 at 4).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the

consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Plaintiff's "boilerplate language" argument fails in this case because boilerplate language is insufficient to support a credibility determination only "in the absence of a more thorough analysis." Hardman, 362 F.3d at 679. In this case, the ALJ conducted a more thorough analysis. The ALJ cited two specific inconsistencies between plaintiff's testimony and the objective medical evidence. First, the ALJ noted that although plaintiff testified that her medication made her drowsy, the medical records showed that plaintiff consistently denied having any side effects from her medications, including at an appointment just two months before the ALJ hearing. (R. 19). The ALJ also relied on medical testing that showed plaintiff's memory and concentration were "grossly intact," despite plaintiff's testimony that she suffered serious problems with memory and concentration. Id. While the ALJ certainly could have cited other inconsistencies in the record to further support his credibility findings, based on the record as a whole, the undersigned is satisfied that the ALJ's credibility findings are closely and affirmatively linked to substantial evidence.

**Medical Source Opinion Evidence**

Finally, plaintiff argues that the ALJ erred in giving great weight to the opinions of the consultative examining physicians and the state agency physicians because their opinions did not consider the bulk of the psychological evidence in the record. Plaintiff also contends that the ALJ did not adequately explain his reasons for ascribing great weight to those reports, other than to state that they were consistent with the medical evidence.

In this case, plaintiff had no real medical opinion evidence from her treating physicians, namely her treating psychiatrist. Plaintiff argues that the ALJ ignored all of the evidence from

Family and Children's Services, but those records do not qualify as medical source opinion evidence because plaintiff's therapy was conduct by a licensed marriage and family therapist, who is not a medical source. See 20 C.F.R. §§ 404.1513, 416.913. The ALJ did consider the records from plaintiff's treating psychiatrist. (R. 19). He noted that the records generally indicated that plaintiff was "oriented and alert," that her "memory is intact, and attention and concentration are grossly intact." Id. The ALJ also cited to the most recent record prior to the ALJ hearing, which found that plaintiff's "anxiety symptoms are still present, but not especially impairing." Id. By February 2011, her depression was improving. Id.

Those findings are consistent with the results of the earlier consultative examination, which took place in March 2010. (R. 18, 546-50). The consultative psychological examiner found that plaintiff's memory was intact, just as her treating psychiatrist did. (R. 18). He also concluded that plaintiff's depression was, in part, situational and was also related to her physical medical conditions. Id. He opined that plaintiff's depression would not prevent her from performing routine tasks and from relating with co-workers and supervisors on a superficial level. Id.

While the ALJ did not engage in a particularly detailed analysis of the reasons for giving great weight to the consultative and state agency opinions, it is clear from the record that the ALJ did not reject any of the medical source opinion evidence. The ALJ found that the records, overall, were consistent with each other, as reflected in the ALJ's residual functional capacity analysis. This finding encompasses the records from plaintiff's treating psychiatrist, which list diagnoses and progress updates but contain no true opinions regarding plaintiff's residual functional capacity. When the ALJ discusses all of the relevant medical evidence, the ALJ is permitted "to engage in less extensive analysis where 'none of the record medical evidence

conflicts with [his] conclusion that [a] claimant can perform light work." Wall v. Astrue, 561 F.2d 1048, 1068 (10th Cir. 2009) (quoting Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004)). Because the "'ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's [residual functional capacity], the need for express analysis is weakened.'" Id. at 1069 (quoting Howard, 379 F.3d at 947). Accordingly, the undersigned recommends a finding that the ALJ did not err in weighing the medical source opinions.

## RECOMMENDATION

For the reasons set forth above, the undersigned recommends that the Commissioner's decision in this case be **AFFIRMED**. The ALJ's findings at step five are consistent with the DOT and demonstrate that plaintiff can perform other jobs existing in significant numbers in the economy. The ALJ also made adequate credibility findings and properly weighed the medical source opinion evidence.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by March 5, 2013.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine de novo any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives

appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73

F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir.

1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district

court or for appellate review.

      SUBMITTED this 19th day of February, 2013.


                                       _____
                                       T. Lane Wilson
                                       United States Magistrate Judge