## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PATRICIA E. KIMBROUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-676-GKF-TLW |
| | ) | |
| CAROLYN W. COLVIN,  Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court is the Report and Recommendation of United States Magistrate Judge T. Lane Wilson on the judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits [Dkt. #20] and the Objections thereto filed by plaintiff, Patricia E. Kimbrough.  [Dkt. #21].

## I.  Standard of Review

Pursuant to Fed.R.Civ.P. 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  However, even under a de novo review of such portions of the Report and Recommendation, this court's review of the Commissioner's decision is limited to a determination of "whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied."  *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  Substantial evidence is "such relevant evidence as a

---

[1] Effective February 14, 2013, pursuant to Fed.R.Civ.P. 25(d), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action.

reasonable mind might accept as adequate to support a conclusion." *Id.* It is more than a scintilla, but less than a preponderance. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). Even if the court would have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *Hamilton v. Secretary of Health & Human Servs.,* 961 F.2d 1495, 1500 (10th Cir. 1992).

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of her alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. § 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if her "physical or mental impairment or

impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §§  404.1520, 416.920; *Williams v. Bowen,* 844 F.2d 7;48, 750 (10th Cir. 1988) (setting forth the five steps in detail).  "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." *Williams,* 844 F.2d at 750.

## II. Procedural Background

Plaintiff, then 43, applied for Social Security disability insurance benefits on August 3, 2009, alleging a disability onset date of April 4, 2009. [TR 128-34, 135-37].  Her last insured date under Title II is December 31, 2013.  [TR 152].  Initially, plaintiff alleged she was unable to work due to breast cancer and uterine tumors; later, she also claimed she was experiencing pain, depression, fatigue, low self-esteem, panic attacks, headaches, chest pain, back pain, drowsiness from her medication and limitations in raising her left arm.  [TR 155-61, 181-88].

Plaintiff's claims for benefits were denied initially on November 3, 2009, and on reconsideration on May 4, 2010. [TR 70-73, 74-78, 79-82, 84-87, 88-90)].  Plaintiff then requested a hearing before an administrative law judge ("ALJ"). [TR 91].  The ALJ conducted a hearing on April 19, 2011.  [TR 27-64].  On April 16, 2011, the ALJ issued a decision denying benefits and finding plaintiff not disabled.  [TR 8-26].  The Appeals Council declined Kimbrough's request to review the case, thus the ALJ's decision serves as the final decision of the Commissioner.  [TR 1-5].

Kimbrough timely appealed the Commissioner's decision.  [Dkt. #2].  She alleged:  (1) the ALJ erred in his step five analysis because she cannot perform any of the jobs the vocational expert identified; (2) the ALJ failed to conduct a proper credibility analysis; and (3) the ALJ improperly weighed the medical source opinions.  [Dkt. #15].  Magistrate Judge Wilson, in his Report and Recommendation, recommended the Commissioner's decision be affirmed.  [Dkt. #20].  Plaintiff timely filed her objection to the Report and Recommendation.  [Dkt. #21].  She re-urges her original arguments.

### III. The ALJ Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since April 4, 2009, the alleged onset date.  [TR 13].  He found the plaintiff had the following severe impairments: breast cancer, depression, anxiety, headaches, substance abuse, vision problems, shortness of breath, carpal tunnel syndrome and uterine tumor.  [*Id.*].  The ALJ, in his review, placed specific emphasis on the following Listings of Impairments:  *Malignant neoplastic Diseases-Adult,* section 13.00; *Special Senses and Speech,* section 2, *Respiratory System,* section 3.l00; and *Musculoskeletal System-Adult,* section 1.00.  [TR 13-14].  He found that despite these impairments, Plaintiff did not meet or equal the criteria established for one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  [TR 14].

The ALJ also considered plaintiff's mental impairments under listings 12.04, *Affective Disorders,* 12.06, *Anxiety-related Disorders,* and 12.09, *Substance Addiction Disorders.* [*Id.*].  In making this analysis, he considered whether "paragraph B" criteria were satisfied.  He found that plaintiff had mild restrictions in activities of daily living and mild difficulties in social functioning and concentration, persistence or pace.  [*Id.*].  He found Plaintiff had no episodes of

decompensation.  [TR 15].  The ALJ concluded that her mental impairment, considered singly and in combination, did not meet or medically equal the criteria of the referenced listings. [TR 14].

With respect to plaintiff's residual functional capacity, the ALJ considered her testimony and the medical evidence.  [TR 17-19].  Plaintiff last completed the ninth grade but obtained her GED.  [TR 17]. She has no problems reading, writing or using numbers.  She last worked April 10, 2009.  [*Id.*].  Her last job was at Lou's Deli, where she worked prepping food for two and a half years.  [*Id.*]. She worked 20 hours a week at $9 an hour. [*Id.*]. She stopped working due to problems with her breast cancer. [*Id.*]. Prior to that, she worked as a tax preparer, customer service representative and business manager.  [*Id.*].  She had a mastectomy of the left breast and had been cancer free for the preceding two years.  [*Id.*]. She has self-esteem issues as a result of her mastectomy, and reported she could only lift her left arm to shoulder level.  [*Id.*].  She has sharp pains in her chest. [*Id.*]. She had a uterine tumor which was removed; as a result, she has sharp pains and needs to use the restroom frequently.  [*Id.*].  She has what she describes as migraine headaches about twice a month and they last about 30 minutes; she usually lies down with these headaches.  [*Id.*].  She feels depressed and anxious; she takes medication for depression. [*Id.*].  She reported problems with her memory and concentration. [*Id.*]. She has no problems getting along with people. [*Id.*].  She uses marijuana every other day; she denied use of other illegal drugs.  [*Id.*]. Her medications make her drowsy. [*Id.*]. She has problems with blurred vision, and doctors have told her she may need glasses.  [*Id.*].  She vacuums sometimes and cooks a little, but does no other household chores.  [*Id.*].  She does not shop or go into stores, but has friends who come and get her to take her out, and she belongs to a cancer survivor group. [*Id.*].  She watches television, reads for pleasure and spends time with her grand kids. [*Id.*].  She

has trouble sleeping at night; on average she sleeps about six hours a night; she naps during the day for about two hours.  [*Id.*].

Plaintiff reported she is able to sit 20-25 minutes before needing to stand; and to stand 5-10 minutes before needing to sit.  [*Id.*].  She can walk a block.  [*Id.*].  Her doctors have not given her any weight restrictions; she is able to lift about 10 pounds; she is able to bend over and touch her knees and her toes. [*Id.*].  She is able to squat but would need to sit in order to get back up. [*Id.*].  She can climb a flight of stairs slowly.  [*Id.*].  She has no problems using her hands or fingers, but later stated she had some tingling in her hands and feet for the past two to three months.  [*Id.*].  She receives no medical treatment for those symptoms.  [*Id.*].  She does not have a driver's license. [*Id.*].  She reported that rain and snow affect her pain.  [*Id.*].

The medical records document plaintiff's left breast mastectomy with immediate reconstruction on August 21, 2009.  The record notes plaintiff was still having pain in September 2009, from the August surgery and that expanders were in place for breast reconstruction.  Her reconstruction surgery took place in December 2009.  [*Id.*]  In March 2010, Plaintiff developed a "wound dehiscence with infection secondary to smoking." [TR 18].  She underwent surgery in late March 2010, and during another surgery in April 2010, the implant was removed due to problems with draining sinus through the mastectomy incision.  [*Id.*].

Plaintiff sought and received treatment for stress in January 2010.  [*Id.*].  She was diagnosed with post-traumatic stress disorder, generalized anxiety disorder and depression, and received treatment from University of Oklahoma psychiatry from January 11, 2010 through February 17, 2011.  [TR 19].  The records show she was prescribed several medications for her mental impairment.  [*Id.*].  She denied side effects from the medications, and most reports indicated that she was oriented and alert, memory was intact and attention and concentration

were grossly intact.  [*Id.*].  The ALJ cited a treatment note from February 17, 2011, which noted

that claimant's anxiety symptoms were still present, but not especially impairing.  [*Id.*]. Her

depression was improving and she obtained a GAF (Global Assessment of Functioning) Score of

70 (some mild symptoms or some difficulty in social, occupational, or social functioning, but

generally functioning pretty well, has some meaningful interpersonal relationships).  [*Id.*].

In March 2010, a psychologist performed a consultative examination. [TR 18].  Plaintiff

told the psychologist, "I have mood swings, and I get upset." [*Id.*]. The psychiatrist noted that

part of the claimant's depression is situational and related to her relational difficulties, as well as

problems with depression related to her general medical condition.  [*Id.*].  He opined that at the

worst, her depression is moderate and should not preclude her from gainful employment.  [*Id.*].

He concluded the claimant should be able to perform some type of routine repetitive task on a

regulator basis, and she would be able to relate adequately with coworkers and supervisors on a

superficial level for work purposes.  [*Id.*].  His diagnoses were mild situational depression,

secondary to her relational difficulties with her fiancé and mild depression, NOS, secondary to

her general medical condition.  [*Id.*].  He, too, assigned plaintiff a GAF score of 70  [*Id.*].

In March 2010, a physician at the State Disability Determination Services ("DDS")

determined Plaintiff's depression was non-severe.  [TR 19].

The ALJ, in reviewing the evidence, found plaintiff's testimony not to be credible or

consistent with the medical evidence. [*Id.*].  For example, claimant had testified to side effects of

her medication making her drowsy, but medical evidence showed she denied side effects from

current medications on several occasions, including her last appointment only two months before

the hearing. [*Id.*].  She testified to problems with memory and concentration, but medical records

showed her memory to be intact and her concentration to be grossly intact. [*Id.*].  The ALJ

concluded the record did not contain any opinions from treating or non-treating physicians indicating that plaintiff was disabled or had limitations greater than those determined in the decision.  [*Id.*].  Additionally, the residual functional capacity conclusions reached by the DDS physicians were consistent with the medical evidence of record. [*Id.*].  The ALJ acknowledged those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians; but he concluded they deserved some weight.  [*Id.*].  The ALJ gave "great weight" to the opinions of the consultative examiners and medical consultants of the DDS, and concluded the medical evidence and opinions were consistent with the ALJ's residual functional capacity findings. [*Id.*].

The ALJ concluded that plaintiff retained the residual functional capacity to perform light work with the following restrictions:  occasional climbing, stooping, squatting, crouching, crawling, kneeling, pushing/pulling, and operation of foot controls; no lifting over the shoulder with her left arm; slight limitation in fingering, feeling and grasping; avoid fine vision and cold and damp environments; avoid dust, fumes and gases; work only in low noise and low light environments (general commercial environments permitted); allow easy access to restrooms; and restrict work to simple, repetitive and routine tasks.  [TR 15].

Based on the residual functional capacity findings, the ALJ concluded that plaintiff could not perform any of her past relevant work, either because it required a higher skill level or a higher exertional level than Plaintiff could perform.  [TR 20].  Based on the testimony of a vocational expert, the ALJ found that plaintiff could perform other work. [TR 20-21].  Representative jobs included hand packager, sorter, cashier, food order clerk, and inspector/checker.  [*Id.* 21].  The ALJ concluded that plaintiff was capable of making a

successful adjustment to other work that exists in significant numbers in the national economy; therefore, a finding of "not disabled" was appropriate.  [*Id.*].

### IV. Medical Records

Plaintiff received a mammogram through a free screening program on April 23, 2009. [TR 471].  The mammogram revealed "a large area of clusters of microcalcification in the lower outer quadrant left breast, suspicious for neoplastic process." [*Id.*].  A second mammogram in June 2009 and a biopsy in July 2006 confirmed a diagnosis of breast cancer.  [TR 464, 470].  She was scheduled for a mastectomy for August 2009.  Meanwhile, she was referred to another doctor in June 2009 after she complained of pelvic pain.  [TR 257-262].  An ultrasound revealed multiple uterine fibroids.  [TR 244]. She had a hysterectomy on August 8, 2009.  [TR 222].  She underwent a mastectomy on August 21, 2009, and doctors immediately started the process of reconstructing her left breast.  [TR 265-288].  Over the course of the next several months, breast reconstruction continued; plaintiff tolerated the process well, and it was completed in late December 2009.  [TR 508-16].  However, in March 2010, she presented for an appointment with a possible infection in her left breast and an "exposed implant."  [TR 717].  Plaintiff's surgeon performed "incision revisions" in the office and in a surgical setting.  [*Id.*].  He determined that plaintiff had continued to smoke despite warnings that smoking could compromise the reconstruction.  [TR 716].  In April 2010, the surgeon was forced to remove the implant and begin the process of reconstructing plaintiff's breast again.  [TR 715].  Plaintiff initially appeared to do well, but the reconstruction surgery was ultimately unsuccessful.  [TR 713-715].  In May 2010, the surgeon removed the tissue expander used to prepare the breast for the implant; he suggested she could begin reconstruction surgery a third time after she healed properly.  [*Id.*].

Following the mastectomy, plaintiff's cancer treatment program included Tamoxifen. [TR 433-434].  She tolerated the medication well until July, 2010, when she began experiencing hot flashes.  [TR 577-586].  In September 2010, her oncologist added Effexor, which resulted in "dramatic improvement in her hot flashes." [TR 576-577].  In the January 2011 treatment note, the oncologist write that plaintiff "admits to no problems at all, difficulty with sedation [or] any other problems, certainly no suicidal ideation; she feels great." [TR 576].

In September 2009, plaintiff sought treatment for an upper respiratory infection at the OU Internal Medicine Clinic. [TR 499-502].  Additionally, she complained of backaches and headaches.  [*Id.*].  She was diagnosed with backache NOS and migraine and prescribed Lortab and Soma.  [*Id.*].  She presented again at the clinic in December 2009, complaining of headaches and stress due to her breast implants and personal/family stresses; she was diagnosed with depression and migraine, and prescribed Paxil.  [TR 496-498].  She was referred to a psychiatric clinic for evaluation and treatment. [*Id.* 498].

In January 2010, plaintiff saw a psychiatrist.  [TR 538-545].  She was diagnosed with major depressive disorder, recurrent, moderate; generalized anxiety disorder; and post-traumatic stress disorder.  [*Id.,* 538].  The psychiatrist switched her medication from Paxil to Celexa, she and also prescribed Trazodone for insomnia; additionally, she recommended psychotherapy to help plaintiff cope with current and past relationship problems and stressful situations.  [*Id.*]. Plaintiff, however, was "looking more for med[ication] management right now." [*Id.*].  Despite plaintiff's depression, in the "competency assessment," the doctor found she could "return to usual work." [*Id.* at 544].  In return visits in February, March, May, June and August 2010, plaintiff reported that the Celexa was helpful and she was less depressed, but multiple stressors still contributed to her depression.  [TR 616-36]. Remeron was added for sleep. [TR 619].  In

these visits, "return to work" was not mentioned in the competency assessment. [TR 631, 635].

In a visit in September 2010, plaintiff reported nightmares, increased anxiety and poor

concentration, although her mood was "a little better," and there was "some improvement" in her

sleep.  [TR 612].  She told the doctor that "[s]he will notice something moving in her room and

think it's a person or will hear a noise and think it is a baby crying in the house." [*Id.*].  The

doctor described these as "more likely to be illusions than true psychotic symptoms" which were

"fairly benign in nature." [TR 614].  The competency assessment stated she was able to "return

to usual work." [*Id.*].  In subsequent visits through February 2011, the doctor continued to

recommend that plaintiff could "return to usual work."  [TR 597-611].  In a January 2011 visit,

she stated she was "doing alright" and having more good days than bad, although her mood did

go down sometimes when dealing with her family, and she reported some anxiety attacks. [TR

602].  After her last recorded visit in February 2011, the doctor stated that plaintiff "appears to

be improving" and her anxiety symptoms "are still present but not especially impairing." [TR

600].

        At each appointment, plaintiff was asked about compliance with her medication and

about side effects.  [TR 597-636].  Each time, she reported compliance with her medication and

denied any side effects.  [*Id.*].  Although plaintiff's medication was adjusted from time to time,

she never complained of drowsiness.  [*Id.*].  She did complain about an inability to concentrate,

but her psychiatrist associated this symptom with her depression and anxiety rather than the

medication.  [*Id.*].

        In March 2010, at the request of the DDS, Dr. Minor Gordon performed a consultative

psychological examination of plaintiff.  [TR 546-550].  Dr. Gordon found plaintiff to be of

average intelligence, and her social-adaptive behavior was within normal limits. [TR 548].  He

stated that plaintiff could pass judgment in a work situation, avoid common danger, maintain her own personal hygiene and communicate comfortably in a social circumstance. [*Id.*]. He concluded plaintiff suffered from situational depression related to relational difficulties with her fiancé as well as to her general medical condition. [TR 549]. He opined that her depression was moderate and should not preclude her from gainful employment. [*Id.*]. He reported that plaintiff's activities of daily living were "less than normal," but her memory was intact in all three phases and her social-adaptive behavior was within normal limits. [*Id.*]. Dr. Gordon concluded plaintiff "should be able to perform some type of routine repetitive task on a regular basis and she would be able to relate adequately with coworkers and supervisors on a superficial level for work purpose." [*Id.*]. He assessed her GAF score as 70. [*Id.*].

In July 2010, plaintiff began therapy sessions with a licensed marriage and family therapist at Family and Children's Services. [TR 728-751]. In her first session, she complained of pain and of poor body image associated with her breast cancer surgeries. [TR 751]. In subsequent visits, she shared issues about her relationship with her fiancé; fears of her cancer returning; concerns about her family, including her granddaughter; and continuing struggles with her body image. [TR 746-749]. Her therapist encouraged her to become more proactive and engaged. [*Id.*]. In a visit on October 6, 2010, she reported having participated in a cancer walk, attending breast cancer survivor meetings, and said she was "on cloud 9" and "feeling normal again." [TR 745]. In subsequent visits through April 11, 2011, plaintiff periodically reported feeling depressed due to numerous stressors in her life, but continued to attend and benefit from her cancer survivor group meetings, to access community resources and to be more proactive in family and personal matters. [TR 734-745]. Only once, on January 26, 2011, did plaintiff

appear groggy and unfocused; she stated she was taking muscle relaxers for breast pain.  [TR 739].

## V. ALJ Hearing

Plaintiff's ALJ hearing was April 19, 2011.  Before plaintiff was sworn in to testify, the ALJ questioned whether plaintiff was awake enough to pay attention during the hearing.  [TR 32]. After she was sworn in, plaintiff testified she lived in a house with her fiancé, granddaughter and uncle; had completed the ninth grade; and had a GED.  [TR 35].  She had additional training as a customer service representative and in business management.  [TR 36].  She last worked prepping food at Lou's Deli, and her last day of work was April 4, 2009.  [TR 36-37].  She quit work because of her cancer.  [TR 37-38].  In the past, she worked as a tax preparer, a cashier, a collector/office assistant for a loan company and a customer service representative.  [TR at 38-39].

Plaintiff testified she is on "depressants," which make her drowsy and "[t]hey have me on hot flashes."  [TR 40].  She had been cancer free for two years. [*Id.*].  Loss of her breast made her feel like she is less than a woman, and she had pain on that side.  [TR 41].  She had a uterine tumor removed, and said she had "sharp pains," but had medication for that.  [TR 41-42].  She has to go to the bathroom frequently.  [TR 42].  About twice a month she has headaches that feel like migraines; the headaches last 30 to 45 minutes.  [TR 42].  When she has a headache, she lies down.  [*Id.*].  She can only lift her left arm to shoulder level.  [TR 43].  She has depression; the medication she takes for it relaxes her a lot; and she is in counseling.  [TR 43-44].  She testified she has problems with memory and concentration.  [TR 44].  She has no trouble getting along with people.  [*Id.*].  She admitted she uses marijuana but denied use of other illegal drugs.  [TR 45].  She smokes a joint or two of marijuana every other day.  [TR 51]. She admitted her doctors

had told her marijuana adversely affects her psychological medications.  [TR 45].  Asked about alcohol use, she stated, "No. I don't like to mix my alcohol with my liquor. Because you don't know what happens."  [*Id.*].  She used to smoke a pack and a half of cigarettes a day but has now reduced that to "numerous cigarettes a day." [TR 52].  Being around smoke and fumes and gasses slows her down with her breathing.  [*Id.*].  She testified she has blurred vision, which might be a side effect of her medications, or might be because she needs reading glasses.  [TR 45].

Plaintiff testified at home she might vacuum, but did not do the dishes, dust, sweep or m op floors, make her bed or do laundry.  [TR 45-46].  She cooks a little.  [TR 46].  She does not shop.  [*Id.*].  She watches television and reads for pleasure; friends and family pick her up for visits.  [*Id.*].  She attends her breast cancer survivor group meetings.  [*Id.*].  She spends time with her grandchildren.  [TR 47].  Plaintiff said her appetite comes and goes.  [*Id.*].  She has trouble sleeping, averaging only six hours a night.  [TR 47-48].  She naps for two hours during the day.  [TR 48].  She can sit for 20 to 25 minutes before she needs to stand and stand for five or 10 minute before she has to sit down; she can walk a block.  [*Id.*].  Her doctors have given her no restrictions on how much weight she can lift or carry; she can lift 10 pounds, and bend over and touch her knees and toes.  [TR 49]. She can squat but has trouble getting back up; she might have to just sit on down, then get up.  [*Id.*].  She can go up and down a flight of stairs if she takes her time. [TR 50].  She testified she has no trouble using her hands or fingers, but had experienced tingling in her hands and feet for two or three months prior to the hearing.  [TR 50, 52-53].  However, she had not sought treatment for those symptoms.  [TR 52-53].  She testified that in rainy or cold weather, her lower back and abdomen hurt, and she just lies around.  [TR 53, 55-56].

Plaintiff testified the reason she does not do work around the house is that she is tired from the medication; when she takes it, she just sleeps.  [TR 54].  She said she was a little drowsy at the time of the hearing, and that this was a "typical day when I take my medication."  [TR 54-55].

She does not drive or have a driver's license.  [TR 53]. She does not ride the bus.  [TR 54]. She has no personal source of income and has no worker's compensation or other litigation pending.  [TR 50].

In his Report and Recommendation, the Magistrate Judge observed that on a number of occasions throughout her testimony, plaintiff gave answers that were nonresponsive.  [Dkt. #20 at 13].  Her response to the ALJ's question about use of alcohol is illustrative of this point.  Prior to swearing her in, when the ALJ asked if she had a problem with taking an oath, she responded, "Okay."  [TR at 31]. Additionally, when asked about whether she could use public transportation, she responded, "Yes, my brother is very familiar with the public—he would ride the bus, if it was necessary.  He would ride the bus to meet. And then he would go with me wherever I need to go."  [TR 54].  The Magistrate Judge stated, "It is not clear whether plaintiff misunderstood the questions, was deliberately non-responsive, or was otherwise impaired."

The vocational expert testified he had reviewed plaintiff's past relevant work.  [TR 56-57].  The ALJ then posed a series of hypotheticals to him.  First he asked the expert to consider a person able to perform medium, light and sedentary work with no functional restrictions due to either anxiety and depression and a pain limitation that permitted plaintiff to change positions as needed.  [TR 58].  The expert opined that plaintiff would be able to perform all of her past relevant work.  [TR 59].  In the second hypothetical, the ALJ incorporated the additional limitation of unskilled work into the first hypothetical.  [*Id.*].  The vocational expert testified that

plaintiff could work a number of other jobs including hand packager, sorter, cashier, food order

clerk and inspector/checker. [*Id.* at 59-60]. In the third hypothetical, the ALJ described the

residual functional capacity that he ultimately adopted in his decision. [TR at 60-61]. The expert

testified that plaintiff could perform all of the light and sedentary jobs identified in the previous

hypothetical. [TR 61]. Finally, the ALJ asked the vocational expert to consider a hypothetical in

which plaintiff's testimony was considered entirely credible. [*Id.*]. The vocational expert

testified that plaintiff would not be able to perform any work under this hypothetical. [*Id.*].

The ALJ asked the vocational expert if his testimony deviated from the dictionary of

occupational titles ("DOT") and needed further explanation, and the expert responded in the

negative. [TR 62]. Plaintiff's counsel raised no objections to the expert's testimony. [*Id.*].

## VI. Analysis

Plaintiff asserts three errors by the ALJ. She argues: (1) the ALJ erred in his Step 5

determination because, due to her limitations, she cannot perform any of the jobs identified by

the vocational expert; (2) the ALJ improperly assessed her credibility analysis; and (3) the ALJ

failed to consider the opinions from the Family and Children's Services records.

## A. Step 5 Determination

The ALJ determined plaintiff had the residual functional capacity to perform light work

as defined in 20 CFR 404.1567(b) and 16.967(b) except, *inter alia,* (1) the claimant was limited

to only occasional "push/pull" and "should avoid lifting over the shoulders with left upper

extremity;" (2) there is a slight limitation in fingering, feeling and grasping; and (3) she should

avoid fine vision.

Plaintiff asserts the vocational expert's testimony conflicts with DOT job descriptions.

Specifically, she contends she cannot perform the job of hand packager (WestLaw *DICOT*

#753.687-038) because it requires constant reaching and handling, and with the slight limitation on fingering, feeling and grasping, she cannot perform constant handling. She argues she cannot perform the jobs of sorter, cashier, food order clerk, inspector and checker (Westlaw *DICOT* #753.587-101; 211.462-101; 209.567-014 and 669.687-014) because they require frequent near vision acuity. Further, she contends she cannot perform any of the jobs because the RFC limited her to occasional push/pull "presumably of hand controls." Finally, she asserts she cannot perform the jobs of cashier and food order clerk because they require a reasoning level of 3.

All of the alleged inconsistencies identified by plaintiff are implied or indirect conflicts rather than direct conflicts. Where, as here, a "conflict" is "implied or indirect," the ALJ is permitted to rely upon the vocational expert's testimony, "provided that the record reflects an adequate basis for doing so." *Segovia v. Astrue,* 226 Fed.Appx. 801, 804 (10th Cir. 2007) (unpublished) (quoting *Carey v. Apfel,* 230 F.3d 131, 146 (5th Cir. 2000)).

As previously noted, the ALJ asked the vocational expert whether his testimony deviated from the *DOT,* and the expert testified it did not. Plaintiff's counsel did not object to any of the expert's testimony or raise any conflict issues.

The *DOT* defines "near vision acuity" and "far vision acuity," but does not define "fine vision," the term used by the ALJ in his hypothetical. However, in posing his hypotheticals to the vocational expert, the ALJ explained that plaintiff "can use [her] eyes, but [she] shouldn't do any extensive amounts of small, tedious tasks with [her] eyes." [TR 60]. Based on the vocational expert's testimony and plaintiff's attorney's failure to raise any objections at the hearing, the ALJ properly relied on the vocational expert's testimony. *See Poppa v. Astrue,* 569 F.3d 1167, 1173 (10th Cir. 2009) (holding that an ALJ has a duty to inquire whether the vocational expert's

testimony conflicts with the *DOT* and to resolve any apparent conflicts before relying upon the testimony).

With respect to the fingering, feeling and grasping limitation, the *DOT* states that the "hand packager" job requires constant handling and fingering, but no feeling (the *DOT*'s term for gripping and grasping).  The ALJ, in posing his hypotheticals to the vocational expert, stated, "I'm not saying they can't use their hand and fingers.  They can.  But they shouldn't be doing extensive amounts of small tedious tasks like pen clip basting, working with small nuts and bolts."  [TR 60].  Based on the ALJ's description, the vocational expert testified plaintiff could perform the hand packager job.  Plaintiff's counsel did not object to the testimony.  Thus, the ALJ was entitled to rely on the expert's opinion.  Moreover, as pointed out by the Magistrate Judge, even if plaintiff is unable to perform the hand packager job based on her fingering, feeling and grasping limitation, the remaining jobs, when considered together, represent a significant number of jobs (1,450 in the region and 158,000 in the United States) that plaintiff can perform. *See Botello v. Astrue,* 376 Fed.Appx. 847, 851 (10th Cir. 2009) (unpublished) (the determination of whether work exists in "significant" numbers may be made based on the availability of jobs nationally or regionally).

Plaintiff also argues all of the jobs identified require at least frequent, if not constant, ability to reach, which she contends would exclude an individual limited to only occasional pushing or pulling.  However, none of the cases she cites support her proposition that "reaching" is identical to "pushing or pulling."  At most, they establish that reaching *may* in some instances encompass pushing or pulling with the upper extremities.  *See Willrodt  v. Astrue,* 2010 WL 2850785, *3 (C.D. Cal.) (the *DOT* breaks down job demands with reference to "reaching and "handling," which *may* encompass pushing or pulling with the upper extremities); *Bennett v.*

*Barnett,* 264 F.Supp.2d 238, 260 n. 5 (W.D. Pa. 2003) (stating that "[t]o the extent repetitive pushing or pulling involves the same type of activity as repetitive reaching," the vocational expert's testimony included jobs that did not require repetitive reaching).

Finally, plaintiff asserts the jobs of cashier and food order clerk require a reasoning level of 3 and since she is limited to simple and repetitive tasks, she cannot perform a job requiring a reasoning level of 3. However, as the Magistrate Judge observed, *none* of the jobs identified by the vocational expert require more than a reasoning level of 2.

Based on the vocational expert's testimony, the ALJ found a significant number of jobs that plaintiff can perform consistent with his RFC. The ALJ's finding was supported by substantial evidence. The alleged conflicts plaintiff cites on appeal of the decision are insufficient to override the vocational expert's testimony. Therefore, the court will not disturb the ALJ's finding. *See Segovia,* 226 Fed.Appx. at 804.

### B. Credibility Determination

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." [TR 17].

Plaintiff asserts that in making this determination, the ALJ improperly rejected her subjective complaints, used "boilerplate language" and failed to make sufficiently specific findings.

The Tenth Circuit has stated:

> Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.

*Cowan v. Astrue,* 552 F.3d 1182, 1190 (10th Cir. 2008) (quotations and citations omitted). Further, the use of "boilerplate findings" is insufficient to support the ALJ's credibility determination only "in the absence of a more thorough analysis." *Hardman,* 362 F.3d at 679.

As noted by the Magistrate Judge, the ALJ cited two specific inconsistencies between plaintiff's testimony and the medical evidence:   First, although plaintiff testified her medications made her sleepy, the medical records showed that plaintiff on several occasions denied having any side effects from her medications, including at an appointment with her psychiatrist just two months before the ALJ hearing.  Second, plaintiff testified to problems with memory and concentration, but medical records showed her memory to be intact and her concentration to be grossly intact.  [TR 19, citing Exhibit 19F].  The court agrees with the Magistrate Judge's conclusion that while the ALJ could have cited other inconsistencies in the record to further support his credibility findings, based on the record as a whole, the ALJ's credibility findings were closely and affirmatively linked to substantial evidence.

### C. Medical Source Opinion Evidence

Plaintiff argues the ALJ erred in attributing "great weight" to the opinions of the consultative examining physicians and state agency physicians because those physicians failed to consider medical information from Family & Children's Services.  However, under 20 C.F.R. §§ 404.1513, 416.913, the Family & Children's Services records do not qualify as "medical source evidence" because plaintiff's therapy was conducted by a licensed marriage and family therapist, who is not a medical source.

Plaintiff also complains the ALJ erred in attributing "great weight" to the opinions of the state agency physicians because they failed to review records from the OU Psychiatry Clinic covering the period of February 2010 to February 2011.  It is true that the agency consultants and

physician did not review *all* OU Psychiatry Clinic records, but this was because their most recent review took place on March 24, 2010.  [TR 552-566].   Furthermore, the ALJ himself considered all records from plaintiff's treating psychiatrist at the OU Psychiatry Clinic covering the entire period from January 2010 to February 2011, observing that "[m]ost reports indicate that the claimant is oriented and alert, memory is intact, and attention and concentration are grossly intact" and in the last visit "it was noted that the claimant's anxiety symptoms are still present, but not especially impairing." [TR 19].  The treating psychiatrist's opinion was consistent with the consultative psychologist's finding that plaintiff's memory was intact and that her depression would not prevent her from performing routine tasks and from relating with co-workers and supervisors on a superficial level for work purpose. [TR 18-19].  And, as the ALJ noted, all of the medical source evidence was consistent with the RFC.  [TR 19].

Plaintiff also contends the ALJ failed to adequately explain his reasons for giving great weight to the consultative examining physicians and state medical consultants other than to state that they were consistent with the medical evidence.  The court disagrees. The Tenth Circuit has explained that "[o]ur precedents allow the ALJ to engage in less extensive analysis where none of the record medical evidence conflicts with [his] conclusion that [a] claimant can perform light work."  *Wall v. Astrue,* 561 F.3d 1048, 1068 (10th Cir. 2009) (citing *Howard v. Barnhart,* 379 F.3d 945, 947 (10th Cir. 2004).  Further, "[w]here . . . the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's [residual functional capacity], the need for express analysis is weakened." *Id.*  Here, the ALJ thoroughly considered all medical source opinion evidence.  Overall, he found it to consistently support a conclusion that claimant could perform light work.  Therefore, the need for express analysis was reduced.

**VII. Conclusion**

For the foregoing reasons, plaintiff's Objections to Magistrate Judge's Report and Recommendation [Dkt. #21] are overruled.  The court accepts the Magistrate Judge's Report and Recommendation [Dkt. #20] and affirms the decision of the Commissioner.

ENTERED this 14th day of March, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT